IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL ANTONIO V.R., <br><br> Petitioner, <br><br> vs. <br><br> U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, <br><br> Respondent. | Civil No. 1:26-cv-04279-MWJS <br><br> ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS <br><br> A# 046-179-313 |

**INTRODUCTION**

Petitioner Rafael Antonio V.R.[1] is detained at the Central Valley Annex pending

his deportation from the United States pursuant to a final order of removal.  He seeks a

writ of habeas corpus under 28 U.S.C. § 2241 directing his immediate release from

immigration custody.  Dkt. Nos. 1, 7.  He argues that his detention pending removal has

become unconstitutionally prolonged, and that his re-detention by Respondent after a

period of release violates his due process rights.  Dkt. No. 1.  In response, the

government contends that Petitioner's failure to facilitate his removal and his lengthy

criminal history, which includes recent convictions post-dating his most recent release

---

[1]     For reasons previously explained in *Sergio D.L.S. v. Warden, Cal. City Corr. Ctr.*, No. 1:26-cv-02821-MWJS, 2026 WL 1049713, at *1 n.1 (E.D. Cal. Apr. 17, 2026), only Petitioner's first name and the initials of his last name are used in this order.

from ICE custody, justify his detention under the Immigration and Nationality Act (INA).

The court concludes that, on the record presented here, Petitioner's detention has become impermissibly prolonged.  And because there is no other lawful basis to detain Petitioner, it GRANTS his petition.

## BACKGROUND

Petitioner was admitted to the United States as a Lawful Permanent Resident at Miami, Florida, on April 29, 1997.  Dkt. No. 7-1, at pg. 2.  Drug use appears to have begun causing problems for Petitioner shortly thereafter.  In February 1999, he was convicted in Florida state court for felony possession of cocaine.  *Id.* at pg. 3.   He was again convicted of the same offense in October 2007 and November 2010, *id.*; in conjunction with the 2007 case, Petitioner was also convicted of misdemeanor possession of cannabis and possession of drug paraphernalia.

In March 2011, Petitioner came to the attention of immigration authorities following an arrest (and later conviction) for loitering or prowling.  Dkt. No. 7-1, at pg. 2; Dkt. No. 7-3, at pg. 21.  An immigration detainer was placed on Petitioner while he remained in local law enforcement custody, and he was transferred into Respondent's custody on March 28, 2011.  Dkt. No 12-1.  While detained, Petitioner was placed into removal proceedings and ordered removed by an Immigration Judge on April 12, 2011.  Dkt. No. 7-2.  The record indicates that Petitioner waived appeal, so that order

immediately became final.  As a result, under the INA, Respondent was required by law to mandatorily detain Petitioner for 90 days following the entry of a final order of removal.  *See* 8 U.S.C. § 1231(a).  But for reasons that are unclear, Petitioner was released on an order of supervision two weeks later on April 26, 2011.  Dkt. No. 7-2.

Shortly thereafter, Petitioner was arrested again in July 2011—this time for purchasing or possessing with the intent to purchase cocaine, a felony of which he was convicted in September 2011.  Dkt. No. 7-3, at pgs. 23-24.  For nearly a decade after that conviction, Petitioner appears to have gotten his life back on track.  With the exception of a 2012 arrest for misdemeanor possession of cannabis and a 2021 citation for driving with a suspended license, the record does not reflect any contacts with law enforcement.  *Id.* at pgs. 29-30.  It appears that Petitioner also remained off the radar of immigration authorities during that time period.  But in April 2022, Petitioner was arrested by Florida law enforcement for burglary of an occupied dwelling and grand theft auto—both felonies—in addition to misdemeanor petit theft.  *Id.* at pgs. 29-32.  And in July 2023, while those charges were pending, he was arrested on a felony charge of fleeing and eluding a police officer.  *Id.* at pg. 41.  Petitioner was ultimately convicted of the three felonies in state court and sentenced to 18 months of imprisonment.  *Id.* at pgs. 35-36, 46.  But as his release date approached, he came to the attention of immigration authorities once again, and on December 23, 2025, Petitioner was released out of the Florida Department of Corrections directly into the custody of Respondent.

He has remained detained in ICE custody ever since—a time period that now exceeds 180 days and counting.

Petitioner filed the instant habeas petition on June 4, 2026.  Dkt. No. 1.  After reviewing the petition, the court ordered the government to show cause why the petition should not be granted.  Dkt. No. 6.  The government timely responded.  Dkt. No. 7.  After reviewing the government's response, the court issued a further order to show cause calling on the government to respond to several factual and legal questions. Dkt. No. 9.  The government again timely responded.  Dkt. No. 12.  The matter is now fully briefed and neither party has requested oral argument.

## DISCUSSION

### A.    Petitioner's *Zadvydas* Argument Is Persuasive

When a noncitizen "has been found to be unlawfully present in the United States and a final order of removal has been entered," the government is called on to secure the noncitizen's removal "during a subsequent 90-day statutory 'removal period.'" *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001); *see* 8 U.S.C. § 1231(a)(1).  During that 90-day period, the INA requires the government to detain the noncitizen.  8 U.S.C. § 1231(a)(2)(A).  If the government has not been able to remove the noncitizen at the conclusion of 90 days, however, then the removal period ends and the "statutory basis" for detention "shift[s] from § 1231(a)(2) to § 1231(a)(6)."  *Diouf v. Mukasey*, 542 F.3d 1222, 1231 (9th Cir. 2008).  And under § 1231(a)(6), the government "'may' continue to detain

an alien who still remains [in the United States] or release that alien under supervision." *Zadvydas*, 533 U.S. at 683 (quoting 8 U.S.C. § 1231(a)(6)).  In other words, detention is permitted but not required after 90 days.

It is undisputed that a final order of removal has been entered for Petitioner. Dkt. No. 1, at pg. 4; Dkt. No. 7-2.  The record reflects that he was ordered removed to Cuba by an immigration judge (IJ) on April 12, 2011, and that he waived appeal.  As a result of that waiver, the IJ's decision was instantly rendered "administratively final," and Petitioner thereby became subject to a final order of removal that same day. 8 C.F.R. § 1241.1(b); *see also Garcia v. Lynch*, 786 F.3d 789, 797 (9th Cir. 2015) (Berzon, J., concurring) (citing *In re Rodriguez-Diaz*, 22 I. & N. Dec. 1320 (BIA 2000), for the proposition that "whenever the right to appeal is validly waived, the decision of the [IJ] becomes final and may be implemented immediately").  Absent some alternative triggering event—a possibility discussed later on in this order—the removal period began on April 12, 2011, and expired 90 days later on July 10, 2011.

But Petitioner was not removed by July 10.  Instead, for reasons the record does not make clear, he was released on an order of supervision on April 26, 2011, after spending only 14 days in post-removal custody.  Dkt. No. 12-1.  His release did not, however, extend or suspend the 90-day removal period, because the INA only allows for extensions under narrowly prescribed circumstances, as when a noncitizen "fails or refuses to make timely application in good faith for travel or other documents necessary

5

to [his] departure or conspires or acts to prevent [his] removal."  8 U.S.C. § 1231(a)(1)(C).  Short of "some sort of bad faith failure to cooperate" on the part of the noncitizen during the removal period, *see M.L.G.G. v. Wamsley*, No. 25-cv-02012, 2025 WL 3539183 (D. Or. Dec. 10, 2025) (cleaned up), the legal basis for detention shifts to § 1231(a)(6) after 90 days.  *See Diouf*, 542 F.3d at 1231.

Petitioner argues that he has been "detained by ICE beyond the removal period." Dkt. No. 1, at pg. 6.  If indeed Petitioner has been detained beyond the 90-day statutory removal period, then his detention is pursuant to § 1231(a)(6).  And as the Supreme Court explained in *Zadvydas*, § 1231(a)(6) does not permit indefinite detention; instead, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."  533 U.S. at 699.  That, Petitioner asserts, is his situation in this case:  he contends that "ICE is not likely to remove [him] in the near future"—in part because he and "the ICE officer assigned to the case" have been "unable to obtain travel documents from Cuban authorities"—leaving him in a state of "continued indefinite detention" which violates his due process rights and requires his release.  Dkt. No. 1, at pgs. 5-6.

To determine whether detention pursuant to § 1231(a)(6) has become unconstitutionally prolonged, the Supreme Court has offered guidance to federal courts about how to assess the duration of detention.  Up to six months, detention is to be treated as "presumptively reasonable."  *Zadvydas*, 533 U.S. at 701.  But if after six

6

months the noncitizen "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government must then "respond with evidence sufficient to rebut that showing." *Id.* And if the government cannot rebut the presumption, the noncitizen must be released. *See id.*

The first step in the *Zadvydas* analysis therefore requires the court to calculate the length of detention. If the record reflects only one uninterrupted detention period post-removal, that calculation can be simple. But where, as here, the record reflects multiple periods of post-removal order detention, the calculation becomes more complicated.

Courts confronted with multiple post-removal order detention periods generally treat the length of detention as "cumulative," i.e., incorporating each and every period of post-removal order detention—an approach "motivated by a concern that the federal government could otherwise detain aliens indefinitely by continuously releasing and re-detaining them." *See Abuelhawa v. Noem*, 811 F. Supp. 3d 847, 855-56 (S.D. Tex. 2025) (collecting cases across circuits). Courts therefore "aggregate detention periods, even over the span of decades," in order to determine the cumulative length of "all post-removal order detention periods." *Phan v. Warden of Otay Mesa Detention Facility*, 813 F. Supp. 3d 1179, 1184 (S.D. Cal. 2025).

The record in this case reflects that Petitioner was detained from April 12, 2011 (the date of his final order of removal) until April 26, 2011 (the date on which he was released on an order of supervision) for a total of 14 days. He was subsequently re-

detained on December 23, 2025, (pursuant to that same final order of removal) and has remained detained to the present, for a total of 197 days and counting.  Added together, these detention periods sum to 211 days in post-removal order custody—an amount that is several weeks past the six-month "presumptively reasonable" threshold articulated in *Zadvydas*.

The next step of the *Zadvydas* analysis requires Petitioner to offer "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."  533 U.S. at 701.  Petitioner has not offered much on this point, and it is admittedly a close call.  But taking into account the record in this case and the court's obligation to liberally construe the arguments of pro se petitioners, *see Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006), the court concludes that he has made just enough of a showing to shift the burden to the government to rebut the presumption.  Petitioner represents that despite his own efforts and the efforts of the ICE officer assigned to his case, the government been unable to obtain travel documents for his removal.  The government implicitly accepts the underlying premise of this argument—that ICE is not likely to obtain travel documents to facilitate Petitioner's removal in the reasonably foreseeable future—but disputes that this obstacle is the fault of anyone other than Petitioner himself; according to the government, Petitioner's own recalcitrance in assisting the government to obtain those documents has prevented his removal from moving forward.

8

The government's argument tees up a factual dispute, as Petitioner does not agree that he has been obstructive. The government's argument also presents a disputed legal issue: whether a court can deem a noncitizen's removal in the post-removal period "reasonably foreseeable," even if as a matter of fact is it not, because the "noncitizen is responsible for the Government's inability to obtain travel documents." *Andemicael v. Noem*, No. 25-cv-02999, 2026 WL 734522, at *5-6 (C.D. Cal. Feb. 12, 2026), *report and recommendation adopted*, 2026 WL 734588 (C.D. Cal. Feb. 20, 2026).

The government is not without cases that arguably support its legal position. *See id.*; *see also Pelich v. I.N.S.*, 329 F.3d 1057 (9th Cir. 2003) (holding that a noncitizen's refusal, during the removal period, to complete paperwork to obtain travel documents was an obstacle of his own making and did not render his removal unlikely). But in the end, the court need not resolve the legal issue here. Nor need it resolve the factual dispute. That is because even under the government's legal theory, it would not be enough for the government to show that Petitioner has refused to be cooperative. The government must make the further showing that "the sole reason" the noncitizen has not been removed "is their refusal to cooperate." *Andemicael*, 2026 WL 734522, at *5. That is, the government must show that removal could be "accomplished with the noncitizen's cooperation." *Id.* at *6.

And nothing in the record or the government's briefing suggests that those circumstances are present here. Petitioner "has been subject to a final order of removal

9

since 2011," but the government has "failed to remove him to Cuba in the 15 years that have since elapsed." *Pantoja v. Bondi*, 818 F. Supp. 3d 1227, 1232 (W.D. Wash. 2026). Its "inability to obtain travel documents during this period strongly suggests" that it is "not likely to obtain them in the reasonably foreseeable future." *Kim v. Chestnut*, No. 26-cv-03725, 2026 WL 382864, at *2 (E.D. Cal. May 18, 2026). And so even if it is true that Petitioner has failed in the past few months to assist the government's efforts to obtain travel documents to facilitate his return to Cuba, "this timeline does not account for the preceding period where no progress was made towards Petitioner's removal." *Nguyen v. Hermosillo*, No. 26-cv-00335, 2026 WL 538497, at *4 (W.D. Wash. Feb. 26, 2026).

But even more important to the *Zadvydas* analysis is the fact that "Respondent[] do[es] not meaningfully dispute that [Petitioner's] removal to Cuba is unlikely." *Pantoja*, 818 F. Supp. 3d at 1232.[2] Indeed, although the government accuses Petitioner of obstruction, it does not represent that that Petitioner's removal could be accomplished if

---

[2]    This point is especially salient in this case insofar as it appears that at the time of Petitioner's removal in 2011, "Cuba was not accepting repatriation of its citizens who received removal orders." *Pantoja*, 818 F. Supp. 3d at 1230; *see also Crespo v. Baker*, No. 11-cv-3019, 2012 WL 1132961 (S.D. Cal. Apr. 3, 2012) (same); *cf. Clark v. Martinez*, 543 U.S. 371, 386 (2005) (noting that the government had "brought forward nothing to indicate . . . a substantial likelihood of removal" after six months and could not do so given its concession that the United States was "no longer even involved in repatriation negotiations with Cuba"). It follows that for at least some portion of the relevant *Zadvydas* period, there was *no* likelihood of Petitioner's removal to Cuba. To be sure, the situation has likely evolved over the course of the last 15 years, but it is nonetheless significant that nothing in the record or briefing addresses whether Petitioner's removal is any more likely today than it was in 2011.

10

only he were to assist in removal efforts.  And there is no argument or evidence in the record to suggest, for example, that Cuba has agreed or would agree to repatriate Petitioner if travel documents could be obtained, that the United States and Cuba have ever engaged in discussions about removing Petitioner, or that Cuba accepts the repatriation of its citizens from the United States (or that Respondent has successfully removed other noncitizens to Cuba) at all.  In other words, without a reason to believe that Petitioner's own obstinance is the primary obstacle standing in the way of his successful removal, and that removal could be achieved with his cooperation, it cannot be said that Petitioner's actions are responsible for the government's inability to remove him in the reasonably foreseeable future.  *See Andemicael*, 2026 WL 734522, at *5-6.

Petitioner has therefore met his burden under *Zadvydas*, and so the government must produce evidence sufficient to rebut the presumption of unreasonableness by showing that Petitioner's removal *is* in fact significantly likely to occur in the reasonably foreseeable future.   Respondent asserts that it can make that showing, apparently irrespective of Petitioner's alleged refusal to assist, based on its representation that "DHS is actively pursuing travel documents and is complying with all Post-Order Custody Review (POCR) processes."  Dkt. No. 12, at pg. 6.  It may be the case that these efforts to effectuate Petitioner's removal will "eventually bear fruit—indeed, it is even possible these efforts will bear fruit soon."  *Malik v. Dosanj*, Civil No. 26-00060, 2026 WL 638483 (D. Haw. Mar. 6, 2026).  But the fact that the government is working to secure

11

travel documents for Petitioner is not, without more, sufficient to show that his removal is significantly likely to occur in the reasonably foreseeable future. *See Jaranow v. Bondi*, 819 F. Supp. 3d 1229, 1237 (W.D. Wash. 2026) (collecting cases); *see also Nguyen v. Mullin*, No. 26-CV-2815, 2026 WL 1480803, at *4 (S.D. Cal. May 26, 2026) (observing that the "mere submission of a travel document request does not itself make removal reasonably likely").

Petitioner has therefore shown that his detention pursuant to § 1231(a)(6) has become unconstitutionally prolonged under *Zadvydas*. So unless his detention can be justified under some other provision of the INA, his continued detention is unlawful and the court must grant his petition and order his immediate release.

### B.      Respondent's Alternative Arguments Are Unconvincing

Respondent argues that three possible alternative statutory provisions independently justify his detention:  8 U.S.C. § 1231(a)(1)(B)(iii); 8 U.S.C. § 1231(a)(2), as triggered by § 1231(a)(1)(C); and 8 U.S.C. § 1226(c).  The court considers each argument in turn.

### 1.      Petitioner Is Not within the Removal Period

Respondent first argues that Petitioner is "presently within the removal period" as defined by statute.  Dkt. No. 12, at pg. 2.  The INA dictates that the "removal period begins on the latest of the following":

(i)      The date the order of removal becomes administratively final;

> (ii)   If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order; [or]
>
> (iii)   If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).  Respondent contends that "Petitioner's December 23, 2025, release from [the custody of the Florida Department of Corrections] triggered subsection (iii)," thereby commencing the removal period afresh, despite its apparent expiration in July 2011.  Dkt. No. 12, at pg. 6.  And because, in the government's view, Petitioner remains within the removal period, his detention is required by 8 U.S.C. § 1231(a)(2).

The government's argument cannot be squared with § 1231(a)(1)(B).  That section, entitled "Beginning of [removal] period," explains how the start of the 90-day removal period can be determined and offers three possible events that may commence that period.  Subsection (i) provides that the removal period starts when a removal order becomes administratively final.  But there are circumstances in which an order may become administratively final before a noncitizen's appeals have been exhausted.  For example, if the BIA dismisses an appeal and that dismissal is appealed to the circuit court of appeals, the appellate court may stay the noncitizen's removal for the pendency of that appeal.  In such situations—where a removal order may be stayed only a few

13

days into the removal period—it would be defy logic (and a court order) to require the government to remove the noncitizen during that 90-day period.

Subsection (ii) accounts for these circumstances by clarifying that when further judicial review of an administratively final order occurs and a stay is entered, the removal period begins on the date of the circuit court's final order—even if that order comes later than 90 days after the final removal order. In that sense, subsection (ii) accounts for situations in which the government is *de jure* prohibited (pursuant to a judicial stay) from effectuating a noncitizen's removal within 90 days of a final removal order. Subsection (iii), in turn, addresses a different scenario but serves a similar purpose: it accounts for those instances in which the government is *de facto* prohibited from effectuating removal within 90 days of an administratively final removal order or final circuit court order, because the noncitizen is "detained or confined" on non-immigration related charges—a point that is especially important if the noncitizen is in the correctional custody of a separate sovereign or involved in an ongoing prosecution. *See, e.g., D'Ambrosio v. I.N.S.*, 710 F. Supp. 269, 271 (N.D. Cal. 1989) (observing that immigration officials "can neither compel a state prison to make its inmates available for immigration hearings nor, as a practical matter, exert . . . authority over inmates . . . so long as they are confined in a state facility"); *see also United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015) (noting the government's discretion to "exercise its

14

judgment that the public interest in criminally prosecuting an alien is greater than the public interest in swiftly removing him").

But it is clear, as other courts have observed, that the triggering events in § 1231(a)(1)(B) can only delay the commencement of the removal period if a "qualifying superseding event" occurs *during the period of removal triggered by the then-latest of the three above-listed events applicable to*" a noncitizen. *Gregory v. B.I.C.E./D.H.S.*, Civil Action No. 06-4008, 2007 WL 708856 (D.N.J. Mar. 6, 2007) (emphasis added). In other words, the removal period can be reset at any point during the 90-day period if an enumerated triggering event occurs. So if Petitioner had been incarcerated at any point between April 12, 2011, and July 10, 2011—that is, the removal period that otherwise would have begun following the entry of his final order of removal—then § 1231(a)(1)(B)(iii) would require the triggering event in subsection (i) to be disregarded in favor of the triggering event in subsection (iii). And under those circumstances, Respondent would be correct that the removal period would only have begun upon Petitioner's release from detention or confinement.

But the period of incarceration Respondent invokes to trigger subsection (iii) occurred over fourteen years after the expiration of the original removal period. And neither the statute itself nor the government's briefing provides any support for the notion "that the removal period can be reset after it has expired." *See Hamama v. Adducci*, No. 17-CV-11910, 2019 WL 2118784, at *2 (E.D. Mich. May 15, 2019). Indeed,

15

the statutory language "references '[t]he' removal period, a single period triggered exclusively by the latest of three possible events." *Diaz-Ortega v. Lund*, No. 19-CV-670, 2019 WL 6003485, at *8 (W.D. La. Oct. 15, 2019). It does not contemplate the existence of multiple discrete removal periods. So unless another triggering event occurs before the singular removal period concludes, "the removal period necessarily begins when a removal order becomes final, and necessarily ends 90 days later." *Id.*

That is what happened here. Petitioner became subject to an administratively final order of removal on April 12, 2011. He did not seek judicial review or obtain a stay, and he was not detained or confined during the 90-day period that followed administrative finality. His removal period therefore began on April 12, 2011, and "necessarily end[ed]" 90 days later. *Id.* At that point, no subsequent triggering event— including a later confinement and release—could reset the clock on Petitioner's removal period. He therefore cannot be detained pursuant to § 1231(a)(2), as triggered by operation of § 1231(a)(1)(B)(iii).[3]

---

[3]     Even if Respondent were correct to assert that Petitioner's release from Florida Department of Corrections custody triggered § 1231(a)(1)(B)(iii) and started a new removal period, his current detention would still fall outside of the removal period. Petitioner was taken into Respondent's custody on December 23, 2025, and so any new removal period would have expired 90 days later. Respondent makes the argument that if Petitioner's removal period is viewed as having begun in December 2025, and can be extended pursuant to § 1231(a)(1)(C), that would place his current detention within the removal period. For the reasons explained in this order, however, § 1231(a)(1)(C) does not apply to Petitioner's situation. He therefore remains outside the removal period under any construction.

16

### 2.   Respondent's Arguments Based on 8 U.S.C. §§ 1231(a)(1)(C) and 1231(a)(2) Are Unpersuasive

Respondent offers a separate basis to find Petitioner within the removal period and detained pursuant to § 1231(a)(2).  It argues that by failing to assist the government in obtaining travel documents to facilitate his removal, Petitioner has "fail[ed] or refuse[d] to make timely application in good faith for travel or other documents necessary to [his] departure," thereby triggering the provisions of 8 U.S.C. § 1231(a)(1)(C).  As discussed above, when such a showing is made, the removal period is to be "extended beyond a period of 90 days and the alien may remain in detention during such extended period."  *Id.*  Respondent's contention, then, is that Petitioner's detention still falls within the removal period because the removal period has been either extended or revived—which would make Petitioner's *Zadvydas* argument premature.

Petitioner appears to dispute this characterization of events, and as an initial matter, it is not clear that the evidence Respondent has submitted to substantiate its account—which consists only of a notice issued to Petitioner warning him that his failure to "assist" in obtaining travel documents violates the INA—is sufficient to invoke § 1231(a)(1)(C).  *Cf. Perez Canet v. Blanche*, No. 2:26-CV-00223, 2026 WL 1091763, at *5-6 (D. Nev. Apr. 22, 2026).  But here again, the court need not address that issue in order to resolve Respondent's argument.  That is because the Ninth Circuit has held that § 1231(a)(1)(C) "merely authorizes the government to *continue* detaining an alien

17

'[d]uring the removal period,'" and does not "function[] as an independent source of detention authority." *Prieto-Romero v. Clark*, 534 F.3d 1053, 1060 (9th Cir. 2008) (quoting 8 U.S.C. § 1231(a)(2)) (emphasis in original).  As a result, once the removal period expires, § 1231(a)(1)(C) can no longer apply.

The government asserts that § 1231(a)(1)(C) applies here to extend the removal period—based on their theory that Petitioner's release from incarceration triggered a new removal period—because in February 2026, while Petitioner would have been within the 90-day window triggered by his December 2025 release from confinement, he "failed to assist" Respondent in good faith to obtain travel or other necessary documents for his release.  Dkt. No. 7-4.  As explained above, however, Respondent's theory that Petitioner was within the removal period in early 2026 is not persuasive.  It follows that § 1231(a)(1)(C) can only place Petitioner within the removal period if he sought in bad faith to prevent his removal back in 2011.  Respondent has been given the opportunity to assert a factual basis from which the court might conclude that the event triggering § 1231(a)(1)(C) began during the removal period in 2011, *see* Dkt. No. 9, but it has not done so.

Respondent further argues that even "if the Court concludes Petitioner is not presently within the removal period, [his] refusal to cooperate with travel-document and removal procedures tolls and extends the period under 8 U.S.C. § 1231(a)(1)(C), authorizing continued custody."  Dkt. No. 12, at pg. 3.  But the government concedes

that it is "not aware of any Ninth Circuit decision applying § 1231(a)(1)(C) where the triggering conduct occurred after the statutory removal period had already expired." Dkt. No. 12, at pg. 4.  This court is likewise unaware of "any case that applied § 1231(a)(1)(C) to permit re-detention following the expiration of the 90-day removal period established by § 1231(a)(2)."  *Larose v. Blanche*, No. 26-cv-00423, 2026 WL 1346636, at *4 (D. Nev. May 14, 2026).  And it can identify no reason why it would be appropriate to interpret § 1231(a)(1)(C) as allowing the government effectively to revive a removal period that has already expired.  Accordingly, the court finds no basis to apply § 1231(a)(1)(C) to extend or revive the removal period here.

### 3. Respondent's 8 U.S.C. § 1226(c) Argument Is Unpersuasive

Respondent's final argument is that if mandatory detention is not permitted under § 1231, then "§ 1226(c) remains a valid, alternative basis for continued mandatory custody" based on Petitioner's most recent arrests and convictions.  Dkt. No. 12, at pg. 5.  If Petitioner were still in removal proceedings and not already subject to a final order of removal, that argument might be entitled to some weight.  But as the Supreme Court has explained, § 1226 and § 1231 serve different purposes:  § 1226 "authorizes the arrest and detention of aliens pending a decision on whether they are to be removed," while § 1231 "explains what to do if the alien is ordered removed."  *Johnson v. Guzman Chavez*, 594 U.S. 523, 543-44 (2021).  In other words, "Section 1226 applies before an alien proceeds through the removal proceedings and obtains a decision; § 1231 applies after."

19

*Id.* at 544.  And so it follows that the government's mandatory detention authority under § 1226(c) "has a definite termination point: the conclusion of removal proceedings."  *Jennings v. Rodriguez*, 583 U.S. 281, 304 (2018) (cleaned up).  Once removal proceedings conclude, that "marks the end of the Government's detention authority under § 1226(c)."  *Id.*

Petitioner was ordered removed in 2011, thereby shifting the government's authority to detain him to § 1231.  *See Diouf*, 542 F.3d at 1231.  And because Petitioner is subject to a final order of removal, § 1226(c) cannot apply.  *Accord Nguyen Tran v. Chestnut*, No. 25-cv-01816, 2026 WL 77023 (E.D. Cal. Jan. 10, 2026).

**CONCLUSION**

Petitioner has been subject to a final removal order for over 15 years.  During that time, it appears that Petitioner has experienced not only periods of relative calm, but also of serious and concerning criminality.  It is therefore unsurprising that when Petitioner reappeared on the radar of immigration authorities during his most recent criminal incarceration, Respondent took him into custody in the hopes of executing the longstanding final order of removal against him.  Those renewed removal efforts may or may not be appropriate—that is not for this court to say—but they cannot be viewed in isolation from the 15-year history that predates them.  Petitioner has been detained well beyond the statutory removal period laid out in the INA.  And as the Supreme Court has explained, the detention of a noncitizen who has been ordered removed

20

cannot be indefinite.  Petitioner has shown that his detention pursuant to § 1231(a)(6) has become unconstitutionally prolonged, and Respondent has offered no other valid basis for his continued detention.  The Constitution therefore requires Petitioner's immediate release.

For the foregoing reasons, Petitioner's Petition for Writ of Habeas Corpus, Dkt. No. 1, is GRANTED.  The court's May 4, 2026, order barring Petitioner's transfer outside this district is LIFTED.  The court ORDERS Respondent to release Petitioner from detention on appropriate conditions of supervision, in accordance with 8 U.S.C. § 1231(a)(3) and 8 C.F.R. § 241.5.  To allow supervising authorities reasonable opportunity to determine appropriate conditions of supervision, the court orders that release be effected within thirty (30) days of the date of this order.  Respondent is ORDERED to file a status report within seven (7) days of release, confirming that Petitioner has been released and reporting on the conditions imposed.

///

///

///

///

///

///

The Clerk of Court is directed to close this case and enter judgment for

Petitioner.

IT IS SO ORDERED.

DATED:  July 7, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 1:26-cv-04279-MWJS; *Rafael Antonio V.R. v. U.S. Immigration & Customs Enforcement, et al.*; ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS